## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.

| | |
|---|---|
| M.F. and A.B., individually and on behalf of all others similarly situated, | |
| Plaintiffs, | **CLASS ACTION** |
| vs. | **JURY TRIAL DEMANDED** |
| ALLERGAN PLC, ALLERGAN, INC., and ALLERGAN USA, INC., | |
| Defendants | |

## CLASS ACTION COMPLAINT

Plaintiffs M.F. and A.B.[1] (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), allege the following:

1.      For years, Defendants manufactured, marketed, and sold defective breast implant products linked to a deadly disease, anaplastic large cell lymphoma.  The United States Food and Drug Administration ("FDA") recently requested that Allergan remove these defective implants, and they have now been recalled worldwide.

2.      Plaintiffs are women who purchased and underwent surgery to have the Allergan implants placed in their bodies and, as a result, are exposed to the risk of developing lymphoma. Defendants have recognized the increased risk of cancer associated with their products, but have

---

[1] Initials are used in place of Plaintiffs' real name due to privacy concerns. M.F. and A.B. choose to proceed using a pseudonym at this stage because they have a substantial privacy right in the personal medical information revealed herein which "outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Plaintiff B v. Francis,* 631 F.3d 1310, 1315–16 (11th Cir.2011)(citation and internal quotation marks omitted).

offered the affected women only the option of having their defective Allergan implants replaced with another Allergan implant.  This offer is insufficient.  Accordingly, Plaintiffs bring this action individually and on behalf of others in the United States to seek relief for damages caused by Defendants' conduct at their expense.

## JURISDICTION

3.      This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceed $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

4.      This Court has personal jurisdiction over the Defendants because they have availed themselves of the consumers and markets in Florida through marketing, solicitation, advertising and the sale of the Allergan products at issue in this lawsuit in Florida, thereby engaging in tortious conduct and causing damages to Plaintiffs and the Class, consumers of the Allergan products in Florida.

## VENUE

5.      Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions and/or misrepresentations giving rise to Plaintiffs' claims occurred in this District. Plaintiffs underwent surgeries involving the Allergan Biocell Products that are the subject of this lawsuit in this District.

## PARTIES

6.      Plaintiff M.F. is a citizen of the State of Florida, residing in Miami-Dade County. In 2007, Plaintiff M.F. underwent a double mastectomy following breast cancer treatment.  On March 20, 2014, she was implanted with a BIOCELL© recalled product, Natrelle 410 Highly Cohesive Anatomically Shape Silicone-Filled breast implants, Reference number MF 410470. Plaintiff M.F. incurred expenses associated with this implant procedure and would not have had the recalled

BIOCELL© product implanted had she known prior to the procedure that implantation with the BIOCELL© product would subject her to the risk of contracting BIA-ALCL, as well as the costs associated with diagnostic fees medical monitoring and invasive diagnostic procedures to detect BIA-ALCL, which she will now be required to endure to ensure that any BIA-ALCL is quickly detected and treated.

7.      Plaintiff A.B. is a citizen of the State of Florida, residing in Broward County. On April 15, 2013, Plaintiff A.B. underwent a double mastectomy to avoid the development of breast cancer given her high risk, and was implanted with a BIOCELL© recalled product, Natrelle 410 Highly Cohesive Anatomically Shape Silicone-Filled breast implants, Reference number FF 410535. Plaintiff A.B. incurred expenses associated with this implant procedure and would not have had the recalled BIOCELL© product implanted had she known prior to the procedure that implantation with the BIOCELL© product would subject her to the risk of contracting BIA-ALCL, as well as the costs associated with removal of the implants which has been scheduled.

8.      Defendant Allergan plc ("Allergan") is a publicly-traded corporation with headquarters in Ireland. Allergan also maintains administrative headquarters in New Jersey and California. Defendant Allergan manufactured, marketed, and sold BIOCELL© saline- filled and silicone-filled breast implants and tissue expanders ("BIOCELL"), which are the subject of this lawsuit and which have been recalled by the FDA.

9.      Defendant Allergan, Inc., formerly known as Inamed Corporation ("Inamed"), and prior to that known as McGhan Medical Corporation ("McGhan"), is a wholly-owned subsidiary of Allergan plc and is incorporated under the laws of Delaware, with its principal place of business in New Jersey.

10.     Defendant Allergan USA, Inc. is a wholly-owned subsidiary of Allergan plc and is incorporated under the laws of Delaware, with its principal place of business in New Jersey.

11.     Defendants Allergan, Allergan Inc. and Allergan USA acted jointly to manufacture and marketing of the BIOCELL products, and as the alter-egos of Allergan.   Accordingly, they are referred to collectively herein as "Allergan" or "Defendants."

## FACTUAL ALLEGATIONS

### A. The Defective BIOCELL Products.

12.     Breast implants are a medical prosthetic product implanted under a women's breast tissue or under the chest muscle in a surgical procedure.  Implants are used in cosmetic surgeries to change the breast's size and shape and reconstruction surgeries after mastectomy or other damage to the breast.

13.     Breast implants are available in various sizes, can have either a smooth or textured shell, and feature one of three types of filler material: saline solution, silicone gel, and composite filler. Textured implants have a slightly roughened surface that adheres to tissue and helps hold the implant in place.

14.     Millions of American women have breast implants.  Each year approximately 400,000 women undergo a procedure to have them implanted, including approximately 300,000 for cosmetic reason and 100,000 for reconstruction after mastectomies performed to treat or prevent breast cancer.

15.     Allergan designed, manufactured, and marketed, from 2006 and until July 24, 2019, a line of breast implant products knowns as BIOCELL©, which included both saline and silicone implants and both textured and smooth versions.

16.     On July 24, 2019, the FDA announced a recall of the textured BIOCELL© products due a "significant increase" in the number of deaths of women who had been implanted with these products  from  a disease known as Breast Implant Associated Anaplastic Large Cell Lymphoma ("BIA-ALCL"), a type of non-hodgkins lymphoma that develops in the tissue around a breast implant.

17.     The recalled BIOCELL<sup>©</sup> products that are at issue in this lawsuit are:

**Allergan Natrelle Saline-Filled Breast Implants** (formerly McGhan RTV Saline-Filled Mammary Implant) approved under P990074. The following are the textured styles:

- Style 163: BIOCELL Textured Shaped Full Height, Full Projection Saline Breast Implants
- Style 168: BIOCELL Textured Round Moderate Profile Saline Breast Implants, also referred to as 168MP (168 Moderate Profile)
- Style 363: BIOCELL Textured Shaped Moderate Height, Full Projection Saline Breast Implants, Allergan catalog includes 363LF, or 363 Low Height Full Projection
- Style 468: BIOCELL Textured Shaped Full Height Moderate Projection Saline Breast Implants

**Allergan Natrelle Silicone-Filled Textured Breast Implants** (formerly Inamed Silicone-Filled Breast Implants) approved under P020056. The following are the textured styles:

- Style 110: BIOCELL Textured Round Moderate Projection Gel Filled Breast Implants
- Style 115: BIOCELL Textured Round Midrange Projection Gel Filled Breast Implants
- Style 120: BIOCELL Textured Round High Projection Gel Filled Breast Implants
- Style TRL: Natrelle Inspira BIOCELL Textured Responsive Silicone-Filled Breast Implants
- Style TRLP: Natrelle Inspira BIOCELL Textured Responsive Silicone-Filled Breast Implants
- Style TRM: Natrelle Inspira BIOCELL Textured Responsive Silicone-Filled Breast Implants
- Style TRF: Natrelle Inspira BIOCELL Textured Responsive Silicone-Filled Breast Implants
- Style TRX: Natrelle Inspira BIOCELL Textured Responsive Silicone-Filled Breast Implants
- Style TCL: Natrelle Inspira BIOCELL Textured Cohesive Silicone-Filled Breast Implants
- Style TCLP: Natrelle Inspira BIOCELL Textured Cohesive Silicone-Filled Breast Implants
- Style TCM: Natrelle Inspira BIOCELL Textured Cohesive Silicone-Filled Breast Implants
- Style TCF: Natrelle Inspira BIOCELL Textured Cohesive Silicone-Filled Breast Implants

- Style TCX: Natrelle Inspira BIOCELL Textured Cohesive Silicone-Filled Breast Implants
- Style TSL: Natrelle BIOCELL Textured Soft Touch Silicone-Filled Breast Implants
- Style TSLP: Natrelle BIOCELL Textured Soft Touch Silicone-Filled Breast Implants
- Style TSM: Natrelle BIOCELL Textured Soft Touch Silicone-Filled Breast Implants
- Style TSF: Natrelle BIOCELL Textured Soft Touch Silicone-Filled Breast Implants
- Style TSX: Natrelle BIOCELL Textured Soft Touch Silicone-Filled Breast Implants

**Natrelle 410 Highly Cohesive Anatomically Shaped Silicone Filled Breast Implants** approved under P040046. The following are the textured styles:

- Style 410FM
- Style 410FF
- Style 410MM
- Style 410 MF
- Style 410 FL
- Style 410 ML
- Style 410 LL
- Style 410 LM
- Style 410 LF
- Style 410 FX
- Style 410 MX
- Style 410 LX

**Allergan tissue expanders for the breast** that have BIOCELL texturing originally cleared as:

- Natrelle 133 Plus Tissue Expander (K143354)
- Natrelle 133 Tissue Expander with Suture Tabs (K102806)

(collectively the "Recalled BIOCELL© Products").

18.     On October 24, 2019, the FDA issued draft guidance entitled "Breast Implants-Certain Labeling Recommendations to Improve Patient Communication." This draft guidance, when finalized, will reflect the FDA's view on this topic. The draft guidance indicates that the FDA over the past few years received information relating to the risks associated with breast implants, including BIA-ALCL

and that the FDA will now provide recommendations concerning the content and format of labeling information for breast implants, including that manufacturers incorporate a boxed warning in a patient decision checklist to ensure that information regarding risks, including BIA-ALCL, are received and understood by patients.

**B.  ALCL Is Known To Be Associated With Breast Implants.**

19.     ALCL is a rare type of blood cancer.  It is most common in children and young adult, males.  It is s serious disease that is most often treated with chemotherapy and steroids.

20.     Though the natural occurrence of ALCL is 1/300,000, FDA studies now place the estimated current risk of BIA-ALCL in women with textured implants to be between 1:3,817 and 1:30,000.

21.     It is now believed that the increased risk associated with Defendants' textured implants specifically results from the textured surface's interaction with the breast tissue.  The implant disrupts the body's normal healing process and is thought to result in scar tissue that s less firm than that produced by smooth-walled implants. It is believed that the Recalled BIOCELL© Products' textured surface creates an implant-induced chronic inflammation that results in injury to the structure of cells in and around the implant.

22.     At least as far back as 2011, there has been evidence of an association between Allergan textured breast implant products and BIA-ALCL.

23.     In January 2011, the FDA first recognized the link between ALCL and breast implants. That month, the FDA released a report on BIA-ALCL, listing as its primary finding the following: "[b]ased on the published case studies and epidemiological research, the FDA believes that there is a possible association between breast implants and ALCL." The FDA further noted that, while it was not prepared to associate a particular type of breast implant with BIA-ALCL, "ALCL has been found

- 7 -

more frequently in association with breast implants having a textured outer shell rather than a smooth outer shell."

24.     In March 2015, an analysis identified 173 cases of ALCL. That same month, the French National Cancer Institute announced, "There is a clearly established link between the occurrence of this disease and the presence of a breast implant."

25.     On May 19, 2016, the World Health Organization ("WHO") gave the disease an official designation as "BIA-ALCL" and classified it as a distinct clinical entity, separate from other categories of ALCL.

26.     In November 2016, Australia's TGA convened an expert advisory panel to discuss the association between breast implants and ALCL and provide ongoing advice.

27.     On March 21, 2017, the FDA released a safety communication updating the current understanding of BIA-ALCL and recognizing the WHO's designation that BIA-ALCL can occur after a patient receives breast implants.  The FDA confirmed that "[a]t this time, most data suggest that BIA-ALCL occurs more frequently following implantation of breast implants with textured surfaces rather than those with smooth surfaces."

28.     In May 2017, a global analysis of forty governmental databases identified 363 cases of BIA-ALCL with 258 being reported to the FDA.

29.     A September 2017 update from the FDA reported that the agency had received a total of 414 medical device reports ("MDRs") related to breast implants and ALCL, including nine deaths.

30.     On May 9, 2018, Australia's TGA reported 72 cases of ALCL in Australian patients.

31.     In December 2018, European authorities announced that Allergan textured BIOCELL© products would be taken off the market due to the association with ALCL.

C.  **Defendants Manufacture Defective Products That Fail To Comply with Federal
     Regulations.**

32.     Pursuant to the federal Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. §

360c et seq., the FDA exercises regulatory authority over the sale of medical devices, including breast

implants.

33.     In 1988, in response to growing safety concerns, the FDA classified both saline-filled

and silicone gel-filled breast implants as "Class III" FDA devices requiring the FDA's premarket

approval ("PMA") under the MDA.  Before this time, breast implants had been a Class II device that

did not require PMA.

34.     Through its PMA process, the FDA evaluates the safety and effectiveness of Class III

medical devices, which are deemed the highest risk.  Once a Class III device has been approved, a

manufacturer may not make any change to the device that could affect its safety or effectiveness unless

that change gets additional approval from the FDA.

35.     A PMA application must contain certain information relevant to the safety and efficacy

of the medical device at issue, including:

      a.      Proposed indications for use;

      b.      Device description including the manufacturing process;

      c.      Any marketing history;

      d.      Summary of studies (including non-clinical laboratory studies, clinical
            investigations involving human subjects, and conclusions from the study
            that address benefit and risk;

      e.      Each of the functional components or ingredients of the device;

      f.      Methods used in manufacturing the device, including compliance with
            current good manufacturing practices; and

      g.      Any other data or information relevant to an evaluation of the safety and
            effectiveness of the device known or that should be reasonably known to the

manufacturer from any source, including information derived from investigations other than those proposed in the application from commercial marketing experience.

36.     In November 2006, Allergan's Natrelle® silicone-filled breast implants received PMA as a Class III medical device. As conditions of this 2006 PMA, however, the FDA required Allergan to conduct six post-approval studies to characterize the long-term performance and safety of the devices.

37.     The FDA mandated post-approval studies for Allergan's Natrelle® Silicone-Filled breast implants included:

a.  Core Post-Approval Studies (Core Studies) – To assess long-term clinical performance of breast implants in women that enrolled in studies to support premarket approval applications. These studies were designed to follow women for 10 years after initial implantation.

b.  Large Post-Approval Studies (Large Studies) – To assess long-term outcomes and identify rare adverse events by enrolling more than 40,000 silicone gel- filled breast implant patients, following them for 10 years.

c.  Device Failure Studies (Failure Studies) – To further characterize the modes and causes of failure of explanted devices over a 10-year period.

d.  Focus Group Studies – To improve the format and content of the patient labeling.

e.  Annual Physician Informed Decision Survey (Informed Decision Study) – To monitor the process of how patient labeling is distributed to women considering silicone gel-filled breast implants.

f.  Adjunct Studies – To provide performance and safety information about silicone gel-filled breast implants for the period when implants could only be used for reconstruction and replacement of existing implants.

38.     The PMA for the Natrelle® products provided that "[f]ailure to comply with any post-approval requirement constitutes a ground for withdrawal of approval of a PMA. Commercial distribution of a device that is not in compliance with these conditions is a violation of the act." Indeed, pursuant to federal law, 21 C.F.R. §§ 814.82 and 814.84, Defendant were obligated to comply with the PMA post approval requirements.

39. Notwithstanding these PMA requirements, Allergan failed to fully report adverse events from the post-market approval studies commissioned as part of the implant's PMA approval, which would have led to reports suggesting the products' association with ALCL.

40. Had Allergan substantially complied with the PMA, rather than underperforming the post-approval requirements, Allergan's disclosures would have led to much wider knowledge of the risks associated with Allergan's products. In addition, Allergan's physician and patient labeling would have materially changed over time, and patients including Plaintiffs, and medical providers including Plaintiffs' physicians, would not have purchased or implanted Allergan's products.

41. Had Defendants complied with their post-market surveillance obligations and the association with ALCL been known, Plaintiffs would have decided against implantation.

42. The deficiencies in Allergan's post-market compliance and conduct of the required studies constituted a "failure to comply with any post-approval requirement" and each constituted a ground for withdrawal of the PMA.

43. Notwithstanding Allergan's failures to comply with FDA PMA requirements, Allergan continued to manufacture and distribute its Natrelle® and BIOCELL© breast implants. As expressly provided in the PMA, such distribution was a violation of federal law.

44. Additionally, Defendants failed to comply with other federal regulations in the manufacturing of the Recalled BIOCELL© Products, which noncompliance also rendered the products defective.

45. For example, 21 CFR § 820.100 required Defendants to establish and maintain procedures for implementing corrective and preventive action with respect to the Recalled BIOCELL© Products. Among other things, Defendants failed to establish and maintain procedures for (1) analyzing processes, work operations, quality records, and other information to identify existing and potential

risks associated with the Recalled BIOCELL© Products and the manufacturer or design defect causing those risks and nonconformities, (2) identifying appropriate actions needed to correct and prevent recurrence of the high risk Recalled BIOCELL© Products; (3) verifying and validating that the appropriate actions to prevent and remedy nonconformities were effective, and (4) documenting the processes and actions discussed above.

46.      Additionally, 21 CFR § 820.30(g) required, but Defendants failed to validate the design of the Recalled BIOCELL© Products by failing, among other things, (1) to ensure that the devices conformed to defined user needs and intended uses, and (2) to test the devices under actual or simulated use conditions.

47.      And, 21 CFR §§ 820.100 and 820.20  required, but Defendants failed to plan, review, and implement the procedures required to ensure a quality system, to satisfy the requirements of current good manufacturing practices, and to implement corrective and preventive action plans in response to the reports regarding ALCL.

48.      Further, 21 CFR § 820.198 required, but Defendants failed to establish adequate procedures for reviewing complaints relating to the Recalled BIOCELL© Products, as further explained below, including those complaints that indicated their association with ALCL, and consequently, failed to adequately evaluate and investigate these products.

49.      Defendants' failure to comply with the above regulations preceded the FDA recall of the Recalled BIOCELL© Products and existed when the subject Recalled BIOCELL© Products were implanted into Plaintiffs.

**D.   <u>Allergan Misrepresents and Omits the Risks of ALCL By Failing to Report Incidents.</u>**

50.      After receiving PMA for a Class III device, manufacturers are subject to a continuous obligation  to report adverse event to the FDA pursuant to  21 U.S.C. § 360i(a)(1) and 21 C.F.R. §

803.50(a).  The manufacturer's reporting obligation carries a duty to vigilantly monitor all reasonably available information, to closely track clinical experiences, and to fully and promptly report all relevant information, specifically but not limited to adverse events, to the FDA, the healthcare community, and consumers.

51.     According to the FDA, the purpose of filing the reports is to monitor device performance, detect potential device-related safety issues, and contribute to benefit-risk assessments. The FDA makes the reports accessible on the FDA's Manufacturer and User Facility Device Experience ("MAUDE").

52.     Under its MDA medical reporting obligations, Allergan had a duty to timely and accurately report complete and current safety information related to the Natrelle® Silicone-Filled breast implants to the FDA.

53.     However, in order to conceal the true number of adverse event reports, Allergan reported adverse event reports with incorrect manufacturer names, instead of under the name "Allergan."

54.     As a result of Defendants' misreporting of adverse events, consumers, healthcare professionals, and the FDA were unable to detect trends in Allergan's products, depriving the market of the necessary information to make an informed decision about whether Allergan's products were safe and effective.

55.     Equally as troubling, Allergan's practice was to bury evidence of ruptures and other injuries by reporting them as "routine events" that did not require public disclosure.  This was done through filing with the FDA "Alternative Summary Reports" ("ASR"), in which Defendants could aggregate multiple events, instead of filing an adverse event report for each individual adverse event.[2] The ASRs require less detail and are not publicly available through the MAUDE website.

---

[2] *See* https://www.icij.org/investigations/implant-files/breast-implant-injuries-kept-hidden-as-new-health-threats-surface/

56.     In 2017, the FDA no longer permitted the filing of ASRs.5 Prior to 2017, there were, on average, fewer than 200 breast implant injuries reported a year. In 2017, this number skyrocketed to 4,567 adverse events, and nearly doubled to 8,242 in the first half of 2018.

57.     Time is of the essence when monitoring and reporting adverse events, especially those indicating an association between a medical product and breast cancer, ALCL, or BIA-ALCL, as required by federal regulations, as well as by Florida law.  Delayed reporting prevents the healthcare community and the public from timely learning of risks which inevitably play a part in their decision-making, including by both physicians and consumers, regarding treatments and procedures, and thereby exposes countless additional women to potential harm.

58.     Due to Allergan's reporting practices, medical professionals and consumers relying on the public reports were unable to draw an accurate conclusion about the safety of a particular medical device. Under Florida state laws, which do not impose duties or requirements materially different from those imposed by federal law.

59.     Under applicable state law, which does not impose duties or requirements materially different from those imposed by federal law, Allergan had a duty to exercise reasonable care in adequately warning Plaintiffs, Class members, and/or implanting medical professionals about the dangers of Allergan's Natrelle® Silicone-Filled breast implants, and about all adverse events of which Allergan became aware, and further, had a post-market duty to identify, monitor, and report all adverse events and all risks associated with the product.

60.     Despite having knowledge and possession of evidence showing that the use of Allergan's Natrelle® Silicone-Filled breast implants was dangerous and likely to place consumers' health at serious risk, as detailed further below, Allergan refused or recklessly failed to identify,

---

(last visited Sep. 24, 2019).

disclose, and warn of the health hazards and risks associated with the product, and about all adverse events that were known to Allergan.

61.     Pursuant to 21 C.F.R. § 814.39(d)(1)-(2), Allergan was permitted to unilaterally make "[l]abeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association" in order to "reflect newly acquired information."

62.     From 2006 through the date of Plaintiffs' implants, Allergan continually acquired new information regarding the strong association between its Natrelle® and BIOCELL© implants and the development of BIA-ALCL; an association that was significantly higher than any other textured breast implant.

63.     Based on the newly acquired information, Allergan had the right to unilaterally make changes to the directions for use ("DFU") for its Natrelle® and BIOCELL© implants to  add or strengthen the warnings about the causal association between the product and the development of BIA-ALCL.

64.     Rather than exercise its right to unilaterally strengthen the information about the link between its product and BIA-ALCL, Allergan instead actively concealed its acquired knowledge of the causal link through its manipulation of adverse event reports and other public reports as described above.

65.     Additionally, under applicable state laws, which do not impose duties or requirements materially different from those imposed by federal law, Allergan had a duty to revise its product labeling after becoming aware of otherwise undisclosed dangers in its Natrelle® and BIOCELL© breast implant products. Allergan refused and recklessly and intentionally failed to do so.

66.     Allergan's insufficient follow-up rates and inadequate data, establish and confirm Allergan's disregard for the safety of hundreds of thousands of women in the United States.

## CLASS ALLEGATIONS

67.     Plaintiffs bring this action individually and as a class action, pursuant to FED. R. CIV.

P. 23(a), 23(b)(2) and/or 23(b)(3). Specifically, the Class consists of the following:

> **Nationwide Class:** All persons in the United States who have been implanted with
>
> BIOCELL© saline-filled or silicone-filled breast implants or tissue expanders that
>
> have been recalled.

Or, in the alternative,

> **Florida Subclass:** All persons in Florida who have been implanted with
>
> BIOCELL© saline-filled or silicone-filled breast implants or tissue expanders that
>
> have been recalled.

68.     Together, the National Class and the Florida Subclass shall be collectively referred to

herein as the "Class." Excluded from the Class are Defendants and their employees, officers and

directors; and the Judge(s) assigned to this case.

69.     Plaintiffs reserve the right to redefine the Class prior to class certification.

70.     The rights of each member of the Class were violated in a similar fashion based upon

Defendants' uniform actions.

71.     This action has been brought and may be properly maintained as a class action for the

following reasons:

> a.     <u>Numerosity</u>: Members of the Class are so numerous that their individual
>
> joinder is impracticable. Plaintiffs are informed and believe that the proposed Class contains at
>
> least thousands of individuals in whom recalled BIOCELL© products were implanted from 2006
>
> through July 24, 2019. The Class is therefore sufficiently numerous to make joinder impracticable,
>
> if not impossible. The precise number of Class members is unknown to Plaintiffs at this time, but

the Class members are readily ascertainable and can be identified by Defendants' records.

b.     <u>Existence and Predominance of Commons Questions of Fact and Law</u>:

Common questions of law and fact exist as to all members of the Class. These questions predominate over any questions affecting only individual Class members. These common legal and factual questions include, without limitation:

i.      Whether Defendants were unjustly enriched by the sale of BIOCELL© recalled products;

ii.     Whether Defendants were negligent in selling BIOCELL© recalled products;

iii.    Whether Defendants failed to warn consumers regarding the risks of the BIOCELL© recalled products;

iv.    Whether Defendants' practices constitute unfair or deceptive acts or practices under the Florida Deceptive and Unfair Trade Practices Act;

v.     The appropriate nature of class-wide equitable relief; and

vi.    The appropriate measurement of restitution and/or measure of damages to Plaintiffs and members of the Class.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

c.     <u>Typicality</u>: Plaintiffs' claims are typical of the claims of all members of the Class who were implanted with recalled BIOCELL© products.

d.     <u>Adequacy</u>: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class that they seek to represent; they have retained counsel competent and highly experienced in complex class action litigation and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their undersigned counsel.

- 17 -

e.    <u>Superiority</u>: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually and effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY – MANUFACTURING DEFECT

#### On Behalf of the Class

72.    Plaintiffs' incorporate the preceding paragraphs as though fully set forth herein.

73.    On or before July 24, 2019, Defendants manufactured and placed into commerce the Recalled BIOCELL© Products that were implanted into Plaintiffs and members of the Class.

74.    The Recalled BIOCELL© Products reached Plaintiffs in substantially the same manner in which they were placed into commerce by Defendants and were not modified or changed before, during and after the time they were implanted into Plaintiffs.

75.    The Recalled BIOCELL© Products were defective and unreasonably dangerous as a result of manufacturing defects, which proximately caused Plaintiffs' injuries. Specifically, when the defective Recalled BIOCELL© Products are surgically placed in the body, the textured surface disrupts

the body's normal healing process and was thought to result in scar tissue that was less firm than that produced by smooth-walled implants. However, it is believed that the Recalled BIOCELL© Products' textured surface creates an implant-induced chronic inflammation that results in injury to the structure of cells in and around the implant. Plaintiffs and Class members have sustained such cellular damage as a result of the Recalled BIOCELL© Products, and a currently unknown number of such Class members will go on to develop BIA-ALCL as a result of this damage and neoplastic transformation.

76. This manufacturing defect was the direct result of Defendants' failure to comply with applicable federal regulations noted above for manufacturing of Recalled BIOCELL© Products before placing them into the stream of commerce.

77. Plaintiffs and Class members have also been injured by undergoing a surgery and implantation of a medical device and invasive diagnostic procedures, and in some cases an explant procedure, that they would not have had done if they were made aware of the true risks posed by the Recalled BIOCELL© Products.

78. Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## COUNT II
## NEGLIGENCE

### On Behalf of the Class

79. Plaintiffs' incorporate the preceding paragraphs as though fully set forth herein.

80. Defendants, as the manufacturers of a Class III medical device, had a duty and were required to comply with and not deviate from federal statutory and regulatory requirements that applied to the Recalled BIOCELL© Products, and similarly had a duty to comply with Florida's common law, but only to the extent parallel to and not different from or in addition to the requirements of federal law. Namely,

a.  Pursuant to 21 C.F.R. § 814.80, Defendants had a duty to manufacture, package, store, label, distribute, and advertise the Recalled BIOCELL© Products subject to the PMA order. Any deviation from the PMA in a manner consistent with the conditions for approval specified by the approval order, without authorization from the FDA, was a violation of federal law;

b.  Pursuant to 21 C.F.R. §§ 814.82 and 814.84, Defendants had a duty and were required to provide all of the post-approval reports and information identified by the FDA in the device's PMA approval order. Any deviation from the PMA approval order, or failure to provide the material known or knowable to Defendants, was a violation of federal law and was also a violation Florida's common law duties as a manufacture and seller to the Plaintiffs, but only to the extent that they are parallel to and not different from or in addition to the requirements of federal law;

c.  Pursuant to 21 C.FR §§ 820.100, 820.20 and 820.198, Defendants had a duty and were required to establish and maintain procedures for ongoing quality reviews of its devices and for implementing corrective and preventative action if processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned products, and other sources of quality data identify potential causes of nonconforming product or other quality problem; and

d.  Defendants were required to be pro-active and investigate the cause of nonconformities and implement effective corrective action. Defendants failed to do so in violation of federal law and also in violation Florida's common law duties as a manufacture and seller to the Plaintiff but only to the extent that they are parallel to and not different from or in addition to the requirements of federal law.

81.     In parallel with federal law, Florida law imposed post-sale duties upon Defendants. They owed a common law duty to monitor the sale, development, and use of Recalled BIOCELL© Products, to discover defects hazards associated with the use of the Recalled BIOCELL© Products, warn the government, doctors, and users of these defects and hazards, and to take other actions to protect those exposed to these defects and hazards.

82.     Further, in parallel with federal law, Florida law treats violations of federal statutes and regulations as evidence of common law negligence and Defendants, as a manufacturer, seller, and distributor of products in Florida, owed a common law duty to comply with all applicable federal laws and regulations.

83.     Despite their duties, Defendants, by and through their agents, were negligent and careless, but only to the extent that such negligence and carelessness are parallel to and not different from or in addition to the requirements, in that they failed to comply with and not deviate from 21 C.F.R. 814.80, 814.82 and 814.84, and 21 C.F.R. 820.30, 820.80, and the conditions set in the PMA approval order, in violation of both the order, 820.100, and Florida's common law duties as a manufactures and sellers, but only to the extent that they are parallel to and not different from or in addition to the requirements of federal law.  Defendants failed to establish and maintain adequate and thorough quality assurance and evaluative systems that, if they had been properly established and maintained, would have caused them to discover the increased risk of BIA-ALCL associated with the Recalled BIOCELL© Products.  As a result of this negligence, Defendants' processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned products, and other sources of quality data failed to identify the increased risk of BIA-ALCL associated with the Recalled BIOCELL© Products.

84.     The Recalled BIOCELL© Products were defective and unreasonably dangerous as a result of manufacturing defects, which proximately caused Plaintiffs' injuries. Specifically, when the defective Recalled BIOCELL© Products are surgically placed in the body, the textured surface disrupts the body's normal healing process and was thought to result in scar tissue that was less firm than that produced by smooth-walled implants. However, it is believed that the Recalled BIOCELL© Products' textured surface creates an implant-induced chronic inflammation that results in injury to the structure of cells in and around the implant.[2] Plaintiffs and Class members have sustained such cellular damage as a result of the Recalled BIOCELL© Products, and a currently unknown number of such Class members will go on to develop BIA-ALCL as a result of this damage and neoplastic transformation.

85.     The manufacturing defects were the direct result of Defendants' failure to comply with applicable federal regulations noted above for manufacturing of the Recalled BIOCELL© Products before placing them into the stream of commerce.

86.     Plaintiffs and Class members have been injured by undergoing a surgery and implantation of the Recalled BIOCELL© Products and invasive diagnostic procedures, and in some cases an explant procedure, that they would not have had done if they were made aware of the true risks posed by the Recalled BIOCELL© Products.

87.     Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## COUNT III

## FRADULENT MISREPRESENTATION AND CONCEALEMNT

88.     Plaintiffs and the Class incorporate the preceding paragraphs as though fully set forth herein.

89.     Defendants fraudulently made affirmative misrepresentations concerning material facts regarding the Recalled BIOCELL© Products and omitted other material facts.  Namely, Defendants

failed to disclose to Plaintiffs and the Class members the true risks associated with the Recalled BIOCELL© Products through submitting inaccurate adverse event reports as well as incomplete warnings contained within the product DFUs.

90.    First, during the time before Plaintiffs underwent their respective implant surgeries, Defendants did not include any warning within its DFU for the Natrelle 120 implants.[3]

91.    Further, only beginning in 2014, did Allergan first include the following warning within its DFU for the Natrelle 410 implants[3]:

Anaplastic Large Cell Lymphoma

- Based on information reported to FDA and found in medical literature, a possible association has been identified between breast implants and the rare development of anaplastic large cell lymphoma (ALCL), a type of non-Hodgkin's lymphoma. Women with breast implants may have a very small but increased risk of developing ALCL in the fluid or scar capsule adjacent to the implant.

- ALCL has been reported globally in patients with an implant history that includes Allergan's and other manufacturers' breast implants.[4]

92.    These representations failed to relay Defendants' actual knowledge of the clear causal connection between the Recalled BIOCELL© Products and BIA-ALCL, an association that was significantly greater than the risk posed by "other manufacturers' breast implants."

93.    Further, beginning in 2006, Defendants continually acquired new information regarding the true risks with the Recalled BIOCELL© Products and their clear causal connection to BIA-ALCL but failed to warn Plaintiffs, Class members, and their physicians by not submitting accurate adverse action reports and failing to unilaterally strengthen their warnings. Defendants' failure to submit accurate adverse event reports made their warning inadequate and the implants defective.

---

[3] *See* https://web.archive.org/web/20131108204233/http://www.allergan.com/assets/pdf/L034-03_Silicone_DFU.pdf (DFU, 2013 and earlier, last visited Sept. 24, 2019).
[4] https://www.allergan.com/miscellaneous-pages/allergan-pdf-files/l3717_410_dfu, pg. 21 (2014 DFU, last visited Sept. 24, 2019).

94.     Pursuant to 21 C.F.R. § 814.39(d)(1)-(2), Allergan was permitted to unilaterally make "[l]abeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association" in order to "reflect newly acquired information."

95.     Despite Allergan's ability to unilaterally strengthen its warning regarding the newly acquired knowledge of the link between the Recalled BIOCELL© Products and BIA-ALCL, it instead chose to actively conceal this knowledge and causal association through its manipulation of adverse event reports and other reporting data.

96.     Had Defendants properly reported those adverse events, the FDA would have required it to add warnings to the label or otherwise disseminate the additional adverse event information to the implanting doctors at a minimum and would have required the Recalled BIOCELL© Products to be recalled sooner. This is confirmed by the FDA's 2019 request that Recalled BIOCELL© Products be recalled and removed from the market once Allergan disclosed the true causal association between the implants and BIA-ALCL.

97.     Moreover, if implanting physicians had been provided with the appropriate warnings regarding the causal connection between the Recalled BIOCELL© Products and BIA-ALCL, they would have chosen to use an alternative product that did not present such a high risk of BIA-ALCL.

98.     Defendants knew or should have known of the true risks with BIOCELL© implants but omitted to disclose these materials facts to Plaintiffs, Class members, and their physicians by not submitting accurate adverse action reports. By submitting misleading adverse event reports, and concealing the risks associated with the Recalled BIOCELL© Products, Defendants misrepresented and omitted facts regarding the true nature of the Recalled BIOCELL© Products.

- 24 -

99.     Plaintiffs and Class members would not have purchased, chosen, and/or paid for all or part of the Recalled BIOCELL© Products had they known that they would be exposed to the risk of developing BIA-ALCL.

100.    Defendants' misrepresentations and omissions have caused Plaintiffs and Class members damages in the form of surgical costs of removal of the products and/or the surgical and diagnostic fees and medical monitoring and invasive diagnostic procedures associated with retention of the products.

101.    Plaintiffs and the Class suffered damages in an amount to be determined at trial.

**COUNT VI**
**UNJUST ENRICHMENT**
**On Behalf of the Class (In the Alternative)**

102.    Plaintiffs and the Class incorporate the preceding paragraphs as though fully set forth herein.

103.    Plaintiffs and the Class members conferred a tangible and material economic benefit upon Defendants by purchasing recalled BIOCELL© implants from 2006 through July 24, 2019. Plaintiffs and Class members would not have purchased, chosen and/or paid for all or part of BIOCELL© had they known that they would be exposed to the risk of developing BIA-ALCL, while Defendants refuse to compensate them for the surgical costs of removal of the products and/or compensate them sufficiently for the surgical and diagnostic fees and medical monitoring and invasive diagnostic procedures associated with retention of the products. Under these circumstances, it would be unjust and inequitable for Defendants to retain the economic benefits they received at the expense of Plaintiffs and the Class.

104.    Failing to require Defendants to provide remuneration under these circumstances would result in Defendants being unjustly enriched at the expense of Plaintiffs and the Class members who endure being exposed to the risk of developing a serious and deadly disease.

105.    Defendants' retention of the benefit conferred upon them by Plaintiffs and the Class would be unjust and inequitable.

106.    Plaintiffs and the Class suffered damages in an amount to be determined at trial.

**COUNT V**
**MEDICAL MONITORING**
**On Behalf of the Class**

107.    Plaintiffs and the Class incorporate the preceding paragraphs as though fully set forth herein.

108.    Due to Defendants' actions and inactions in violation of federal law, medical monitoring is, to a reasonable degree of medical certainty, necessary in order to diagnose properly the warning signs of BIA-ALCL.

109.    Plaintiffs and the Class are thus entitled to have Defendants pay for the costs of ongoing medical monitoring.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request, individually and on behalf of the Class, that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of the Florida Class defined above, and designate Plaintiffs as the class representative and Plaintiffs' counsel as counsel for the Class;

B.    award equitable and injunctive relief, including but not limited to, requiring Defendants to institute a medical monitoring program for Class Members, restitution, and

disgorgement of profits;

        C.     award all actual, general, special, incidental, punitive, and consequential

damages to which Plaintiffs and Class members are entitled;

        D.     award pre-judgment and post-judgment interest on such monetary relief;

        E.     award reasonable attorneys' fees and costs; and

        F.     grant such further and other relief that this Court deems appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

110.    Plaintiffs hereby demand a jury trial for all claims so triable.

DATED this 25th day of October, 2019.

| | |
|---|---|
| GROSSMAN ROTH YAFFA COHEN, P.A. | COLSON HICKS EIDSON, P.A. |
| 2525 Ponce de Leon Blvd., Suite 1150 | 255 Alhambra Circle, Penthouse |
| Coral Gables, FL 33134 | Coral Gables, Florida 33134 |
| Telephone: (888) 296-1681 | Tel: (305) 476-7400 |

By:  */s/ Neal A. Roth*

    Neal A. Roth
    Fla. Bar No. 220876
    Rachel Wagner Furst
    Fla. Bar No.  45155
    Natasha Cortes
    Fla. Bar. No. 389020
    Email: nar@grossmanroth.com
    Email: rwf@grossmanroth.com
    Email: nsa@grossmanroth.com

By:  */s/ Lewis S. Eidson*

    Lewis S. "Mike" Eidson
    (Florida Bar No. 151088)
    mike@colson.com
    Julie Braman Kane
    julie@colson.com
    Curtis Miner
    curt@colson.com
    Francisco Maderal
    frank@colson.com

*Attorneys for Plaintiffs and the Proposed Class*